IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| YSAURO MUNOZ, | ) | CIVIL NO. 06-00649 JMS/KSC |
| | ) | |
| Plaintiff, | ) | ORDER (1) DENYING PLAINTIFF'S |
| | ) | MOTION FOR SUMMARY |
| vs. | ) | JUDGMENT, AND (2) GRANTING |
| | ) | DEFENDANT'S MOTION FOR |
| GORDON R. ENGLAND, Secretary | ) | SUMMARY JUDGMENT |
| of the Navy, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

**ORDER (1) DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, AND (2) GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**I. INTRODUCTION**

On February 28, 2002, Plaintiff Ysauro Munoz ("Plaintiff") and the

Commander of the Navel Ship Repair Facility ("NSRF") in Yokosuka, Japan,

Plaintiff's employer, signed a settlement agreement in which Plaintiff agreed to

withdraw two complaints he had filed with the Navy's Equal Employment Office

("EEO"). These complaints charged that the NSRF discriminated against Plaintiff

on the basis of race and age, by, among other things, withholding training

opportunities from him. As part of the settlement, the NSRF agreed to provide

Plaintiff "training to enhance [his] career within 12 months from the date of this

agreement."  Pl.'s Ex. 1.

Plaintiff's Amended Complaint states two claims: (1) that Defendant breached the settlement agreement by failing to provide Plaintiff with career enhancing training within 12 months of the agreement (Count I), and (2) that the denial of training constitutes retaliation against Plaintiff for opposing unlawful employment practices and filing his EEO complaints (Count II).  Currently before the court is Plaintiff's Motion for Summary Judgment,[1] and Defendant's Motion for Summary Judgment on Counts I and II.  The court also raises sua sponte the issue of subject matter jurisdiction over Count I.  Based on the following, the court finds that it has subject matter jurisdiction over Count I, DENIES Plaintiff's Motion for Summary Judgment, and GRANTS Defendant's Motion for Summary Judgment.

///

///

///

///

---

[1]  It is unclear whether Plaintiff moves for summary judgment on Count I only, or on both Counts I and II.  Plaintiff's Motion addresses mainly the breach of settlement agreement issues, but also argues that Defendant's reasons for denying Plaintiff training are pretext.  To the extent understandable, the court addresses all of Plaintiff's arguments.

## II. BACKGROUND

A.    **Factual Background**

    *1.    Plaintiff's Duties with the NSRF*

       Since February 1987, Plaintiff has been employed at the NSRF as an

Engineering Technician, level GS-12, in the Combat Systems Department,

Weapons Systems Division.  Pl.'s Statement of Material Facts ("Pl.'s SMF") ¶ 1;

Def.'s Resp. to Pl.'s SMF ¶ 1.  Plaintiff's responsibilities include "providing

technical, repair and modernization services to the Navy's ships and weapons

systems."  Pl.'s SMF ¶ 1; Def.'s Resp. to Pl.'s SMF  ¶ 1; *see also* Pl.'s Ex. 2, 252[2]

(Counselor's Report) (describing Plaintiff's specialty as being in "guided missile

launchers, loaders, and control systems.  To perform these duties, [Plaintiff]

applies knowledge[] of mechanical, electrical, electronic, and pneumatic

engineering.  He is also considered the 'regional expert' on the assigned

systems").

       Beyond this description, the parties dispute the focus of Plaintiff's

---

[2]  Several of Plaintiff's exhibits appear to be compilations of several documents and/or selected portions of larger documents.  For example, Plaintiff's Exhibit 2 appears to be portions of the Investigative File from Plaintiff's EEO complaints, Exhibit 8 is a collection of pages of statutes, regulations, and Navy human resources materials, and Exhibit 22 appears to be a March 20, 2006 declaration of Peter Rita, along with relevant exhibits.  Several exhibits also include hand-written page numbers, with gaps in their sequence.  In referring to Plaintiff's exhibits, the court provides as much descriptive information as possible to identify the cited information.

duties.  Plaintiff claims that his "career area of expertise" is as a Launcher Technician, working on torpedo launchers, Asroc launchers, and MK 13 launchers.  Pl.'s Ex. 3, Munoz Aff. ¶ 2.  In contrast, Defendant asserts that Plaintiff has worked on a variety of systems that handle torpedoes, missiles, and ammunition.  Jan. 28, 2008 Rita Decl. ¶ 1.[3]  Indeed, one reason Plaintiff filed his first EEO complaint was that he was advised that others would "'have the lead'" on equipment that he normally worked on, including MK 13 missile launchers, MK 32 torpedo tubes and related equipment, and MK 38 chain guns.  Def.'s Ex. 10; *see also* Def.'s Ex. 13, 9 (listing weapon systems on which Plaintiff provided technical support services).

On May 21, 1997, Plaintiff was informed that his position (*i.e.*, "billet") would be abolished upon his departure, and that he was eligible to register in the Priority Placement Program ("PPP") for return to the United States when a position for which he qualified became available.  Def.'s Ex. 2; Jan. 4, 2008 Rita Decl. ¶ 3.  While enrolled in the PPP, Plaintiff was granted repeated six-month extensions of his tour at the NSRF.  Jan. 4, 2008 Rita Decl. ¶ 3.

---

[3]  In support of each of its Summary Judgment filings, Defendant submitted a declaration authorized by Peter Rita.  The court cites to each Rita declaration by date, e.g., Jan. 4, 2008 Rita Decl., Jan. 24, 2008 Rita Decl., and Feb. 1, 2008 Rita Decl.  Plaintiff also submitted as Plaintiff's Exhibit 27 a January 26, 2004 affidavit by Rita, cited here as Pl.'s Ex. 27, Jan. 26, 2004 Rita Aff.  Defendant submitted two declarations by Tom Cairney, and the court refers to each Cairney declaration by date, e.g., Jan. 4, 2008 Cairney Decl., and Jan. 24, 2008 Cairney Decl.

## 2. *Plaintiff's EEO Complaints*

On August 21, 2001, Plaintiff filed a formal complaint of

discrimination on the basis of age and race with the EEO.  Pl.'s Ex. 2, 249 (Formal

Complaint of Discrimination); Def.'s Ex. 10.  Plaintiff explained that:

> Training has also been an issue for some time, I.E. lack of
> career enhancement training and lack of funding for myself and
> my MLC counterpart to attend Engineering Working Group
> [("EWG")] meetings.  We have attended one EWG meeting in
> the last nine years.  Attendance is required to keep up with
> engineering changes, new problems, fixes and discussions
> pertaining to the MK13 Missile Launchers and components. . . .

Def.'s Ex. 10.  An EEO counselor listed Plaintiff's allegations of being denied

training as including: (1) a "briefing concerning ship alterations to the Hellfire

missile handling and stowage systems . . . . and a second potential travel for

certification of another system;" (2) an EWG briefing on torpedo takedown

systems; and (3) an EWG meeting concerning the MK 13 chain gun.  Pl.'s Ex. 2,

253 (Counselor's Report).[4]  Plaintiff's requested resolution included that he be

sent to "EWG conferences and other appropriate training."  *Id*. at 252.

On November 26, 2001, Plaintiff filed a second formal complaint

---

[4]  The text of this exhibit is annotated to state that the relevant EWG conferences were a "briefing on MK 13 missile launcher systems" and an "EWG meeting concerning the MK-13 missile launcher."  The court cannot determine whether this annotation was part of the original file, or added by Plaintiff.  Because this language is not determinative of the issues presented here, the court merely notes this difference for the record.

with the EEO, alleging reprisal for his first EEO complaint.  *Id.* at 261 (Second

Formal Complaint of Discrimination).  Both complaints were accepted by the EEO

and consolidated.  *Id.* at 270 (Notice of Acceptance and Consolidation of

Discrimination Complaint).

### 3.     *The February 28, 2002 Settlement Agreement*

On February 28, 2002, Plaintiff and the Commander, NSRF, signed

an agreement to settle Plaintiff's EEO complaints.  Pl.'s Ex. 1.  The agreement

recited Plaintiff's allegations of discrimination and retaliation, including the

following:

> As the result of discrimination on the basis of race (Hispanic)
> and age (DOB 7/31/44), since January 1998 management of the
> Combat Systems Office, Ship Repair Facility, Yokosuka,
> Japan, has denied you Engineering Working Group (EWG)
> training and not allowed you to attend conferences.  The last
> incident was the EWG meeting of the MK-13 chain gun in
> April 2001.

*Id.*

By signing the agreement, Plaintiff agreed to withdraw his allegations

of discrimination:

> [Plaintiff] hereby irrevocably and unconditionally releases,
> acquits and forever discharges [Defendant] from any and all
> charges, complaints, claims, liabilities, obligations, promises
> agreements, controversies, damages, actions, causes of action,
> suits, rights, demands, costs, losses, debts and expenses related

6

> to [Plaintiff's] discrimination Complaint addressed in this
> Settlement Agreement.

*Id*. For its part, Defendant agreed to:

> provide training to enhance Mr. Munoz' career within 12
> months from the date of this agreement.

*Id.*

> The agreement further states that it:

> represents the entire agreement between [Plaintiff] and the
> Commander Ship Repair Facility, Yokosuka, Japan.  There are
> no other agreements between the parties, either expressed or
> implied, oral or written.

*Id.*  Despite this clause, Plaintiff asserts that Robert Nolan ("Nolan"), who signed

the agreement and is Chief of the Labor/Employee Relations and Services

Division of the NSRF, orally agreed that Plaintiff would receive Vertical Launch

Systems ("VLS") training as part of the settlement agreement.[5]  *See* Pl.'s Ex. 30,

71.

### 4. *Training Opportunities Provided to Plaintiff*

Post-settlement, Defendant provided Plaintiff several training

opportunities.  Plaintiff attended VLS deluge valve overhaul training on March 19,

---

[5]  It appears that Plaintiff may not have requested VLS training prior to the February 28, 2002 settlement agreement.  In response to the deposition question "[p]rior to signing the settlement agreement had you ever requested VLS training?" Plaintiff responded "I think so, but I'm not sure on that."  Pl.'s Ex. 30, 70.

2002, an MK 13 EWG conference on June 4, 2002, and MK 44 machine gun training on January 21, 2003.[6]  *See* Pl.'s Ex. 22, 159 (Training History for Munoz, Ysauro); Def.'s Ex. 6.

Peter Rita ("Rita"), who was Combat Systems Director at the NSRF and managed the billets, contends that the VLS deluge valve overhaul training and MK 44 machine gun training were career enhancing because they gave Plaintiff "a skill and a certification he did not previously have, one that was in demand both at Yokosuka and in the Navy worldwide."  Jan. 4, 2008 Rita Decl. ¶¶ 9, 11.  In comparison, Plaintiff contends that none of these training opportunities was career enhancing.  The VLS Deluge valve overhaul training did not result in any certification, and the resulting work was not a full time position, but rather a support or collateral activity.  Woodworth Aff. ¶ 15.  Plaintiff further contends that the MK 13 and the MK 44 were not included in his position description

///

///

///

///

---

[6]  After the one-year period, Plaintiff also attended Magazine Sprinkler Inspection and MK 45 training in 2005.  *See* Jan. 4, 2008 Cairney Decl. ¶ 4; Def.'s Ex. 1, 127-28.

during the settlement compliance period.[7]  Pl.'s Ex. 3, Munoz Aff. ¶ 10.  Finally,

Plaintiff contends that the MK 13 EWG conference was not career enhancing

because the MK 13 was being phased out in favor of the VLS.  *Id.*

### 5.     *Training Opportunities Denied to Plaintiff*

Defendant denied Plaintiff's post-settlement agreement requests for

VLS training (as opposed to the VLS deluge valve overhaul training).  The parties

agree that "VLS is the primary missile launching systems used on surface

combatant ships and of such importance to the United States Navy that only

personnel certified by the Naval Ships Weapons Center as Systems Maintenance

Technician ("SMT") or Test Director [("TD")] are allowed to supervise work on

the system."  *See* Def.'s Concise Statement in Support of Def.'s Mot. ("Def.'s

SMF") ¶ 7; Pl.'s Resp. SMF ¶ 7.  The VLS training base course is three months

long, and conducted in Port Hueneme, California.  Jan. 4, 2008 Rita Decl. ¶ 7.

Plaintiff first requested VLS training in April 2002.  In an April 2,

2002 email, Rita forwarded Plaintiff's VLS training request to Nolan, and

---

[7]  Plaintiff also asserts, with no evidentiary support, that the NSRF was prohibited from servicing the MK 44.  Pl.'s Ex. 3, Munoz Aff. ¶ 12.  Despite Plaintiff's statements, Plaintiff was told in 2004 that NSRF was able to perform work on the MK 44 at the operator level (as opposed to the higher levels of maintenance), Def.'s Ex. 14, and was counseled in 2005 that he was to provide assistance with the MK 44 as part of his duties.  Def.'s Ex. 15.  Further, it appears that Plaintiff continued to work on the MK 13 through the summer of 2004 when it was divested.  *See* Jan. 24, 2008 Rita Decl. ¶ 4.

explained that he had no intention of approving this request for three reasons:

> (A) Our new VLS Technician, Mr. V. Preciado will be arriving later this month.  He is a Certified System Maintenance Technician (SMT) capable of handling all VLS work.  Even with the training, Mr. Munoz is requesting, he would not have the necessary credentials to function in this field without years of additional hands on experience and sponsorship from someone in the VLS community.  He'd essentially be a helper and we already have an MLC in C190 who fulfills that role as do some of our shop personnel, so we really don't need another helper.  This is not as "career enhancing" as he might think.
> (B) We have requested a change in our USN Billet Structure converting a SPY-1A Technician to VLS Technician which we expect to have approved and the new CPO on board this year.  Two VLS Technicians is more than adequate to cover work on our VLS ships even during high port loading.
> [(C)] This training is cost prohibitive.  Total cost for over 3 months of school is around $17,000 (99 Days @ $145.00 per day per diem + $1,800.00 of rental car + $700.00 in air fare).  I am not going to spend 1/3 of my annual training for the department on one individual.

Pl.'s Ex. 31.  Rita stated that Plaintiff would likely consider this denial a breach of

the settlement agreement, and requested "professional help" to prevent additional

assertions of discrimination by Plaintiff.  *Id.*  In response, Nolan stated:

> There was never anything in the settlement agreement that stated he could request any courses.  You are not obligated in anyway to approve any training requests from him.  Furthermore, he has contacted me and informed me he does not believe mgt has complied with the settlement agreement regarding the letter of regret he received.  Therefore, until further notice, all bets are off.

*Id.*

Plaintiff renewed his request for VLS training several times over the next year, and each time, Rita reiterated the reasons for denying Plaintiff this training.  In an October 29, 2002 email to Plaintiff, Rita explained that of the two VLS technician billets at the NSRF, neither was available.  Pl.'s Ex. 22, 137. Victor Preciado held one billet, and the other billet was "permanently downgraded to GS-11," causing it to be transferred to another area.  *Id.*  As a result, Rita would "not entertain any additional requests for VLS related training by anyone other than Mr. Preciado."  *Id.*

In an August 26, 2003 email to Plaintiff, Rita further explained why the one of the two VLS technician billets was downgraded to GS-11, and as a result, could not provide Plaintiff VLS training:

> (a) When I assumed the Director's position there were two (2) authorized billets, held by Mr. Woodworth and Mr. Chambers.
> (b) Mr. Chambers elected not to renew his contract here and took a position with NSWCPHD.  His vacancy was advertised and after a 5~6 month gap was filled by Mr. Preciado.
> (c) During this time, Mr. Woodworth filed an appeal with OPM saying that his position was mis-classified as a GS-12 and should be a GS-13.  OPM reviewed his PD and rendered a decision that his PD was, in fact, graded as a GS-11, not GS-12 and ordered that he be down graded.  Mr. Woodworth left SRF before such action could take place.
> (d) OPM direction was that their decision was binding on SRF and recruitment for the additional VLS SMT could only

11

be done at the GS-11 level.  This, of course, rendered it impossible to recruit due to the extensive training and experience needed to achieve SMT qualifications.

(e) In view of the above, I decided to request permission from the PMB to delete the VLS billet and acquire the services of an Electronics/Fire Control technician to cover weaknesses in this area.  Permission was granted and Mr. Midcap was hired to fill this spot.

. . .

I explained that I could not assign you work as a VLS technician based upon the above and would not spend thousands of dollars in training you in a skill that I cannot use you for.

Pl.'s Ex. 21; Def.'s Ex. 8.

A July 21, 2004 "Memorandum for the Record" further explains

Rita's reasons for denying another request:

On Monday, 12 July 2004, [Plaintiff] submitted a third consecutive identical request for VLS Training to his supervisor.  His previous requests were denied, as he is not assigned responsibility for VLS [and is] therefore inappropriate for his position, and we have only one authorized billet for a VLS technician, currently held by Mr. V. Preciado. . . . .

On Thursday, 15 July 2004, I held a meeting with Mr. Munoz and Mr. Cairney and for the third time, explained to Mr. Munoz that his request for VLS training was denied.  During the meeting, Mr. Munoz expressed that he felt that this request was "different", as he has requested "Re-Training" because his skills have been rendered obsolete by the divestment of the MK 13 launching systems from FDNF ships and he can no longer compete for other positions outside of SRF.  Although I expressed sympathy for his situation, I explained that this command has no obligation to "Re-Train" him in another systems simply because of that, but do need to ensure that he

12

has meaningful work to do while still employed at SRF. To that end, Mr. Cairney has identified and proposed relevant career enhancing training as a Magazine Sprinkler Inspector and on the new MK 45 MOD 4 5"/62 Caliber Gun System. I advised Mr. Munoz that this training was approved, pending availability of billets.

Pl.'s Ex. 22, 134.

In addition to these reasons, Defendant contends that Plaintiff would not have the requisite skills, even after training, to fill a VLS technician billet in the NSRF. As revised in July 2001, the billet requires an SMT certification card, followed by ten years experience as a VLS technician in a mainland facility. Jan. 4, 2008 Rita Decl. ¶ 7(b); Def.'s Ex. 5. Rita has never authorized anyone to attend VLS training. Jan. 4, 2008 Rita Decl. ¶ 8.

Plaintiff asserts that Defendant's reasons are pretext. Between October 8, 2001 through at least July 1, 2002, organizational charts for the NSRF indicated a vacant VLS position. Pl.'s Ex. 26. Plaintiff hypothesizes that Rita could have filled the VLS position at a GS-12 level, because Rita can write, revise, or even add a new billet, as shown from the fact that Rita converted the down-graded VLS position to a fire control billet. Pl.'s Resp. SMF ¶ 7(a); Pl.'s Ex. 27, Jan. 26, 2004 Rita Aff. (stating that he converted the down-graded VLS position description to a fire control billet). Plaintiff further contends that he was well

13

qualified for a VLS position due to his years of experience.  *See* Woodworth Aff. ¶ 13; Pl.'s Ex. 29, 154 (discussing experience with missile systems).  Plaintiff also posits that none of the individuals who held VLS billets met the revised VLS position description.[8]  Pl.'s Resp. SMF 7(b) (*citing* Woodworth Aff. ¶ 9; Pl.'s Ex. 28).  Finally, Plaintiff believes that cost was not an issue because, as discussed above, Plaintiff was sent to the mainland for other training opportunities.

**B.     Procedural Background**

     ***1.     EEOC Actions***

          Plaintiff filed two EEO complaints concerning the denial of VLS training.  First, on April 12, 2002, Plaintiff requested that the NSRF reopen his original EEO complaint due to Defendant's alleged failure to comply with the terms of the settlement agreement.  Pl.'s Ex. 5.  On June 13, 2002, the EEO notified Plaintiff that it had determined that there was no breach because the agreement did not identify any specific training, and the one-year period to provide training had not elapsed.  *Id.*  Plaintiff appealed this decision to the EEOC, who, in an August 7, 2003 decision, remanded the matter back to Defendant to

---

     [8]  Woodworth and Chambers became VLS technicians prior to the position description revision in 2001.  Plaintiff cites no evidence for the assertion in his Response to Defendant's Concise Statement that Mr. Preciado, who replaced Mr. Chambers, did not meet the revised requirements.

investigate whether Plaintiff was provided training during the 12-month period. Pl.'s Ex. 4, *available at Munoz v. England*, 2003 WL 21953731, at *1 (E.E.O.C. Aug. 7, 2003).

On September 4, 2003, the EEO notified Plaintiff that it had reviewed Plaintiff's training records, and found that Plaintiff had attended five classes between February 28, 2002 and August 29, 2003.  Pl.'s Ex. 6.  The EEO determined that three of these classes -- rigging gear inspection, MK 44 machine gun training, and the MK 13 EWG conference -- were "directly related to [his] duties as an Engineering Technician, GS-12" and hence, career enhancing.  *Id.*  On October 8, 2003 Plaintiff appealed this decision to the EEOC.

In the second action, on February 28, 2003, Plaintiff filed another formal complaint alleging breach of the settlement agreement based on the denials of VLS training.  *See* Pl.'s Ex. 7, *available at Munoz v. England*, 2005 WL 1714421, at *1 (E.E.O.C. Jul. 12, 2005).  The EEO investigated Plaintiff's claim and issued a report to Plaintiff, who then requested a hearing before an administrative judge.  The administrative judge dismissed Plaintiff's complaint for lack of jurisdiction because the new complaint concerned the same allegations as Plaintiff's first action, *i.e.*, breach of settlement agreement.  *Id.*  Plaintiff appealed this decision to the EEOC.

In a July 12, 2005 decision, the EEOC addressed both complaints. The EEOC affirmed dismissal of the second complaint for lack of jurisdiction, and found as to the first complaint that Plaintiff "failed to show breach of the February 28, 2002 [settlement agreement]" and Defendant had "substantially complied" with the settlement agreement. *Id.*, *Munoz*, 2005 WL 1714421, at *3.

### 2. *Procedural History in Federal District Court*

On December 27, 2005, Plaintiff filed a Complaint in the United States District Court for the District of Columbia, alleging that Defendant breached the February 28, 2002 settlement agreement by failing to provide career enhancing training to Plaintiff.  On March 31, 2006, Plaintiff filed an Amended Complaint, alleging two counts: (1) breach of settlement agreement (Count I); and (2) violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e (Count II).  On November 20, 2006, the District Court for the District of Columbia transferred the case to the District of Hawaii on Defendant's motion.

On January 4, 2008, the parties filed: (1) Defendant's Motion for Summary Judgment on Counts I and II, and (2) Plaintiff's Motion for Summary Judgment.  On January 24, 2008, the parties filed Oppositions, and on January 31, 2008, Replies.  On February 7, 2008, Plaintiff filed a Motion to Compel discovery responses and for sanctions.  A hearing on the Motions for Summary Judgment

was held on February 11, 2008.

At the end of the hearing, based on an inquiry by Defendant, Plaintiff appeared to argue that his February 7, 2008 Motion to Compel was in fact a Federal Rule of Civil Procedure 56(f) Motion.  The court ordered Plaintiff to show cause how his Motion to Compel is properly viewed as a Rule 56(f) Motion, and Plaintiff submitted a brief on February 22, 2008.

In addition to these issues, the court raised sua sponte whether it has subject matter jurisdiction over the breach of contract claim.  Doc. No. 92.  The parties were given an opportunity to discuss this issue at the hearing, and Plaintiff provided briefing on February 22, 2008.

## III.  <u>STANDARD OF REVIEW</u>

Summary judgment is proper where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  Rule 56(c) mandates summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 321 (1986); *see also Broussard v. Univ. of Cal. at Berkeley*, 192 F.3d 1252, 1258 (9th Cir. 1999).  "In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof

concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 321 (internal quotations omitted).

The burden initially lies with the moving party to show that there is no genuine issue of material fact. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The moving party may discharge its burden by showing that there is "an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. "When the moving party has carried its burden under Rule 56(c) its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . [and] come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586-87 (1986) (citation and internal quotation signals omitted); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (A party cannot "rest on mere allegations or denials of his pleading" in opposing summary judgment.). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 248. Thus, in responding to a defendant's purportedly undisputed facts, the plaintiff must set forth, by affidavit or otherwise as provided in Rule 56, "specific facts showing that there is

a genuine issue for trial." *Id.* at 250.

An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.  An issue is material if the resolution of the factual dispute affects the outcome of the claim or defense under substantive law governing the case.  *See Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 919 (9th Cir. 2001).

When considering the evidence on a motion for summary judgment, the court must draw all reasonable inferences on behalf of the nonmoving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587.  However, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 127 S. Ct. 1769, 1776 (2007).

## IV.  ANALYSIS

### A.   Plaintiff's Motion to Compel as a Rule 56(f) Motion

Before turning to the substance of the parties' Motions for Summary Judgment, the court first addresses Plaintiff's Motion to Compel.  *See Garrett v. City & County of S.F.*, 818 F.2d 1515, 1518 (9th Cir. 1987) (finding that the district court failed to exercise its discretion with respect to a discovery motion by

denying it "moot" after having first granted defendants' summary judgment

motion).

> Pursuant to Federal Rule of Civil Procedure 56(f):

> If a party opposing the motions shows by affidavits that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
> > (1) deny the motion;
> > (2) order a continuance to enable affidavit to be obtained, depositions to be taken, or other discovery to be undertaken; or
> > (3) issue any other just order.[9]

"A party requesting a continuance pursuant to Rule 56(f) must identify by affidavit

the specific facts that further discovery would reveal, and explain why those facts

would preclude summary judgment." *Tatum v. City & County of S.F.*, 441 F.3d

1090, 1100 (9th Cir. 2006). "Under Rule 56(f), an opposing party must make clear

---

[9] Rule 56(f), as quoted, became effective December 1, 2007 and "shall govern in all proceedings thereafter commenced and, insofar as just and practicable, all proceedings then pending." *See* April 30, 2007 Order of the Supreme Court of the United States Amending Rules; *see also* Fed. R. Civ. P. 86 (stating that the "rules and amendments take effect at the time specified by the Supreme Court, subject to 28 U.S.C. § 2074" and govern pending proceedings unless "the Supreme Court specifies otherwise," or "the court determines that applying them in a particular action would be infeasible and work and injustice"). "The language of Rule 56 has been amended as part of the general restyling of the Civil Rules to make them more easily understood and to make style and terminology consistent throughout the rules. These changes are intended to be stylistic only." Rule 56 Advisory Committee Notes, 2007 Amendments. Because the amended version of Rule 56(f) governs, and no substantive change in the law was intended, the court interprets the new rule by applying precedent related to prior version of Rule 56(f). *See United States v. Wilson*, 429 F.3d 455, 458 n.2 (3d Cir. 2005) (noting that amendment moving Fed. R. Crim. P. 32 into Fed. R. Crim. P. 11(d) did not substantively change the rule such that "precedent referring to Rule 32 continues to be authoritative").

what information is sought and how it would preclude summary judgment." *Garrett*, 818 F.2d at 1518. "Failure to comply with the requirements of Rule 56(f) is a proper ground for denying discovery and proceeding to summary judgment." *Brae Transp., Inc. v. Coopers & Lybrand*, 790 F.2d 1439, 1443 (9th Cir. 1986); *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 989 (9th Cir. 1999) (finding that failing to file the required Rule 56(f) affidavit detailing with particularity the information sought was fatal to request for further discovery); *see also Marquez v. Cable One, Inc.*, 463 F.3d 1118, 1121 (10th Cir. 2006) ("We have held that, where a party opposing summary judgment and seeking a continuance pending completion of discovery fails to take advantage of the shelter provided by Rule 56(f) by filing an affidavit, there is no abuse of discretion in granting summary judgment if it is otherwise appropriate." (citation and quotation signals omitted)); *Woods v. City of Chic.*, 234 F.3d 979, 990 (7th Cir. 2000) (finding that failure to file an affidavit in support of a Rule 56(f) motion justifies the district court's decision to deny the motion).

Plaintiff's Motion to Compel does not meet the requirements of Rule 56(f). In his Motion to Compel, Plaintiff argues that several of Defendant's discovery responses are deficient, and in four instances states "[i]n accordance with Fed.R.Civ.P. 56(f), it is necessary that this discovery matter be resolved prior

21

to ruling on summary judgment." Pl.'s Mot. Compel 4, 5, 8, 9. Despite the reference to Rule 56(f), Plaintiff submitted no affidavit identifying "the specific facts that further discovery would reveal, and explain[ing] why those facts would preclude summary judgment." *See Tatum*, 441 F.3d at 1100; *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d at 989. Further, even if the court overlooked Plaintiff's failure to provide an affidavit, his Motion to Compel nonetheless fails to provide the specific facts that discovery would reveal, and explain why those facts would preclude summary judgment.

At the court's request, Plaintiff submitted supplemental briefing on February 22, 2008.[10] Plaintiff again failed to submit a Rule 56(f) affidavit, and again failed to explain how his Motion to Compel made clear what information was sought and how that information would preclude summary judgment. *See Garrett*, 828 F.2d at 1518 ("Under Rule 56(f), an opposing party must make clear what information is sought and how it would preclude summary judgment."). For these reasons, to the extent Plaintiff's Motion to Compel seeks a Rule 56(f)

---

[10] While arguing the Motions for Summary Judgment at the February 11, 2008 hearing, Plaintiff did not claim that his Motion to Compel should be viewed as a Rule 56(f) Motion; instead, the issue was raised at the conclusion of the hearing by Defendant. Upon further questioning by the court, Plaintiff appeared unsure about the requirements of Rule 56(f), and thus could not adequately explain how his Motion to Compel met these requirements. The court therefore required Plaintiff to submit supplemental briefing addressing why his Motion to Compel should be viewed as a Rule 56(f) Motion.

continuance, his request is DENIED.

## B.     Count I: Breach of Settlement Agreement

Defendant argues that (1) the court lacks subject matter jurisdiction to award any relief for a breach of the settlement agreement beyond specific performance; and (2) summary judgment should be granted in Defendant's favor because Plaintiff was provided career enhancing training as required by the settlement agreement.  Plaintiff argues that (1) he is entitled to the full range of relief afforded under Title VII for Defendant's breach of settlement agreement; and (2) summary judgment should be granted in his favor because he was not provided career enhancing training.  In addition to these issues, the court sua sponte considers whether it has subject matter jurisdiction over this claim.  The court first determines that it has jurisdiction over this claim, and then addresses whether summary judgment should be granted.

### 1.     *Subject Matter Jurisdiction*

The court has an obligation to ensure that it has jurisdiction over the claims raised by the parties, and may raise this issue sua sponte.  *See Grupo Dataflux v. Atlas Global Group, L.P.*, 541 U.S. 567, 593 (2004) ("[I]t is the obligation of both district court and counsel to be alert to jurisdictional requirements."); *Williams v. United Airlines, Inc.*, 500 F.3d 1019, 1021 (9th Cir.

2007) ("[W]e are 'obliged to raise questions of the district court's subject-matter jurisdiction sua sponte.'" (*quoting Hart v. United States*, 817 F.2d 78, 80 (9th Cir. 1987)).

Plaintiff's Count I states a breach of settlement agreement claim against a federal agency, the United States Navy. The United States and its agencies have sovereign immunity from all lawsuits unless Congress expressly waives that immunity. *Dep't of Army v. Blue Fox, Inc.*, 525 U.S. 255, 260 (1999); *United States v. Testan*, 424 U.S. 392, 399 (1976). The waiver must be "unequivocally expressed" and "not enlarged beyond what the language requires." *United States v. Nordic Vill.*, 503 U.S 30, 33-34 (1992) (internal alterations and quotation omitted); *Blue Fox*, 525 U.S. at 261 (Any legislative waiver of immunity must be strictly construed "in favor of the sovereign.").

Because the agreement at issue settled Plaintiff's EEO complaints, Title VII is a potential basis of jurisdiction. Courts addressing this issue -- *i.e.*, whether Title VII grants the courts jurisdiction over a breach of settlement agreement claim against a federal agency -- have reached conflicting decisions. *Compare Lindstrom v. United States*, 510 F.3d 1191, 1194 (10th Cir. 2007) ("The EEOC, through 29 C.F.R. § 1614.504(a), has thus limited Mr. Lindstrom to suing on his original discrimination claim and not to enforce his settlement agreement.

24

The district court therefore did not have subject matter jurisdiction to hear his suit under Title VII."); *and Frahm v. United States*, 492 F.3d 258, 262 (4th Cir. 2007) ("Because neither the settlement agreement nor a statute allow Miss Frahm to sue the government for breach of the settlement agreement, her action was properly dismissed."), *with Kraft v. Johanns*, 2007 WL 2212890, at *11-15 (D.N.D. July 31, 2007) (analyzing the relevant statutory provisions, caselaw, and policy considerations to determine that it has subject matter jurisdiction); *and Owens v. West*, 182 F. Supp. 2d 180, 190 (D. Mass. 2001) ("[T]his Court concludes that enforcement of an EEOC pre-determination settlement agreement is a civil action brought directly under Title VII and, therefore, governed by its relevant procedural requirements.").  The Ninth Circuit has yet to address this issue.[11]

---

[11]  The court recognizes the circuit split regarding whether courts have jurisdiction to enforce private employer (as opposed to federal agency) settlement agreements reached prior to EEOC involvement, i.e., "predetermination settlement agreements."  *See Lindstrom v. United States*, 510 F.3d 1191, 1195 n.5 (10th Cir. 2007) (collecting cases); *Kraft v. Johanns*, 2007 WL 2212890, at *13 (D.N.D. Jul. 31, 2007) (same).  The Ninth Circuit has determined that in the private sector, "[g]enuine investigation, reasonable cause determination and conciliation are jurisdictional conditions precedent to suit . . . ."  *E.E.O.C. v. Pierce Packing Co.*, 669 F.2d 605, 608 (9th Cir. 1982); *see also Cook v. City of Pomona*, 884 F. Supp. 1457, 1462-63 (C.D. Cal. 1995) (applying *Pierce Packing Co.* to find that an action seeking enforcement of a settlement agreement between two private parties was not brought under Title VII, but was rather "merely an action to enforce a private settlement agreement" governed by state law).  *Pierce Packing Co.* is not determinative to the issue presented here, *i.e.*, whether a claimant can bring a civil action against a federal agency for breach of a settlement agreement.  Further, *Pierce Packing Co.* stands for the unremarkable proposition that a claimant must comply with the exhaustion requirements outlined in Title VII to bring suit.  As described below, 29 C.F.R. part 1614 outlines when a claimant may file a civil action; Plaintiff has complied with these requirements.

Due to this unresolved issue of law, the court provided the opportunity for both parties to brief whether the court has subject matter jurisdiction over this claim.  The government declined to submit a brief, while Plaintiff argued that Title VII grants the court jurisdiction based largely on the policy concerns iterated in *Kraft*.  Based on a reading of the relevant statutory and regulatory framework, the court finds that it does have subject matter jurisdiction over Plaintiff's breach of settlement agreement claim, but lacks jurisdiction in this case to award any relief beyond specific performance.

　　　　　　　　a.　　　*Statutory and regulatory framework*

Title VII provides that "[a]ll personnel actions affecting employees or applicants for employment [with a federal agency] shall be made free from any discrimination based on race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-16(a).  Federal district courts are granted jurisdiction over civil actions "brought hereunder."  42 U.S.C. § 2000e-16(d) (adopting provisions of § 2000e-5(f)-(k), including that "[e]ach United States district court . . . shall have jurisdiction of actions brought under this subchapter").

42 U.S.C. § 2000e-16(b) grants authority for the EEOC to enforce Title VII, and issue regulations as needed:

　　　　　　　　[T]he Equal Employment Opportunity Commission shall have

authority to enforce the provisions of subsection (a) of this section through appropriate remedies, including reinstatement or hiring of employees with or without back pay, as will effectuate the policies of this section, and shall issue such rules, regulations, orders and instructions as it deems necessary and appropriate to carry out its responsibilities under this section.

In 29 C.F.R. part 1614, the EEOC issued regulations governing federal sector discrimination claims. Federal agencies are encouraged to settle Title VII complaints:

Each agency shall make reasonable efforts to voluntarily settle complaints of discrimination as early as possible in, and throughout, the administrative processing of complaints, including the pre-complaint counseling stage. Any settlement reached shall be in writing and signed by both parties and shall identify the claims resolved.

29 C.F.R. § 1614.603.

If a claimant believes that an agency breached a settlement agreement, he may seek redress pursuant to 29 C.F.R. § 1614.504:

(a) . . . . If the complainant believes that the agency has failed to comply with the terms of a settlement agreement or decision, the complainant shall notify the EEO Director, in writing, of the alleged noncompliance within 30 days of when the complainant knew or should have known of the alleged noncompliance. The complainant may request that the terms of settlement agreement be specifically implemented or, alternatively, that the complaint be reinstated for further processing from the point processing ceased.

(b) The agency shall resolve the matter and respond to the

complainant, in writing.  If the agency has not responded to the complainant, in writing, or if the complainant is not satisfied with the agency's attempt to resolve the matter, the complainant may appeal to the Commission for a determination as to whether the agency has complied with the terms of the settlement agreement or decision. . . .

Beyond these specific provisions, Subpart D of 29 C.F.R. part 1614 also outlines the procedures governing complaints, appeals, and civil actions. Section 1614.401(e), "Appeals to the Commission," recognizes that "a complainant . . . may appeal to the Commission an agency's alleged noncompliance with a settlement agreement or final decision in accordance with § 1614.504." *See also* 29 C.F.R. § 1614.402(a) (describing the timing requirements for filing an appeal for noncompliance with a settlement agreement). Section 1614.405(a), "Decisions on Appeals," states that "[t]he Office of Federal Operations, on behalf of the [EEOC], shall issue a written decision setting forth its reasons for the decision."  This decision is "final" for purposes of bringing a civil action authorized under 29 C.F.R. § 1614.407.  29 C.F.R. § 1614.405(b).

Regarding civil actions, § 1614.407 provides that:

A complainant who has filed an individual complaint . . . is authorized under title VII . . . to file a civil action in an appropriate United States District Court:
(a) Within 90 days of receipt of the final action on an individual or class complaint if no appeal has been filed;
(b) After 180 days from the date of filing an individual

28

or class complaint if an appeal has not been filed and
final action has not been taken;
(c) Within 90 days of receipt of the Commission's final
decision on an appeal; or
(d) After 180 days from the date of filing an appeal with
the Commission if there has been no final decision by the
Commission.

b.      *Jurisdiction over Plaintiff's breach of settlement agreement
claim*

In determining whether a claimant may bring a breach of settlement

agreement claim against a federal agency, the court bears in mind that "[a]s a

general interpretive principle, 'the plain meaning of a regulation governs.'" *Safe

Air for Everyone v. U.S. Envtl. Prot. Agency*, 488 F.3d 1088, 1097 (9th Cir. 2007)

(*quoting Wards Cove Packing Corp. v. Nat'l Marine Fisheries Serv*., 307 F.3d

1214, 1219 (9th Cir. 2002)).  "The plain language of a regulation, however, will

not control if 'clearly expressed [administrative] intent is to the contrary or [if]

such plain meaning would lead to absurd results.'"  *Id*. (*quoting Dyer v. United

States*, 832 F.2d 1062, 1066 (9th Cir. 1987) (alterations in original)).  Further,

"[w]hen construing a regulatory term that appears ambiguous in isolation, this

court places the term in context in an attempt to derive its meaning."  *Trans World

Marine, Inc. v. Hogarth*, 220 Fed. Appx. 477, 478-79 (9th Cir. 2007) (*citing

Alaska Trojan P'ship v. Gutierrez*, 425 F.3d 620, 628 (9th Cir. 2005)).

29

On its face, 29 C.F.R. § 1614.504 is silent as to whether a claimant may, after receiving an unfavorable EEOC determination, proceed to federal court. Reading § 1614.504 in isolation, the court would likely conclude that a claimant could not file a civil action in federal court claiming a breach of a settlement agreement. Statutory language, however, "has meaning only in context[,]" *Graham County Soil & Water Conservation Dist. v. United States*, 545 U.S. 409, 415 (2005), and reading other portions of 29 C.F.R. part 1614 in context demonstrates that the EEOC -- through its regulations -- intended to provide a claimant the right to bring an action in federal court based on an allegation of a breach of a settlement agreement. Specifically, Subpart D of 29 C.F.R. part 1614 provides that a claimant can (1) "appeal to the Commission an agency's alleged noncompliance with a settlement agreement or final decision in accordance with § 1614.504," 29 C.F.R. § 1614.401(e); (2) receive a "final decision" by the Office of Federal Operations on behalf of the EEOC, 29 C.F.R. § 1614.405; and (3) file a civil action within 90 days of receiving this final decision. 29 C.F.R. § 1614.407(c). Accordingly, the court concludes based on the entire regulatory framework that a claimant meeting the requirements of 29 C.F.R. part 1614 is authorized to file a civil action in federal district court claiming a breach of a

settlement agreement.[12]

  This construction is consistent with EEOC's interpretation of its own regulations to allow Plaintiff to file a civil action.  In its July 12, 2005 decision, the EEOC found that Plaintiff failed to show any breach of the settlement agreement, and then outlined Plaintiff's rights on appeal.  Consistent with the court's interpretation of the regulations, the EEOC described that Plaintiff can request that the EEOC reconsider its decision, *see* 29 C.F.R. § 1614.405, and/or file a civil action within 90 days from receiving its decision.  Pl.'s Ex. 7; *available at Munoz*, 2005 WL 1714421, at *4.  The EEOC's interpretation is reasonable and entitled to at least some deference.  *See Fed. Exp. Corp. v. Holowecki*, 128 S. Ct. 1147, 1155 (2008) (discussing different standards of deference given to agency statements on regulations, and noting that an agency is entitled "deference when it

---

  [12]  A contrary reading of 29 C.F.R. part 1614 is possible.  That is, because 29 C.F.R. § 1614.504 merely requires a complainant seeking redress for a breach of a settlement agreement to "notify the EEO Director," and because § 1614.407 permits the filing of a civil action only by "a complainant who has filed an individual complaint," a complainant simply notifying the EEO Director of a breach may not satisfy § 1614.407's requirement that the complainant file an individual complaint.

  Although feasible, this construction ultimately fails.  A claimant alleging a breach of settlement agreement has already filed a complaint (unless the agreement is reached in the pre-complaint counseling stage), and § 1614.407 does not specify that the EEOC's final decision must be on a specific individual complaint filed in relation to the breach of settlement agreement claim; instead, it merely requires that a complainant "filed *an* individual complaint." (emphasis added).  Here, Plaintiff filed two individual EEO complaints prior to entering into the settlement agreement, and filed his civil action within 90 days of receiving a final decision from the EEOC on his claim of breach of the settlement agreement.

adopts a reasonable interpretation of regulations it has put in force").

Based on the above, the court finds that it has jurisdiction over Plaintiff's breach of settlement agreement claim.[13]  The court does find, however, that Plaintiff's available remedies for this claim are limited to seeking specific performance.  Section 1614.504(a) provides that "[t]he complainant may request that the terms of settlement agreement be specifically implemented or, alternatively, that the complaint be reinstated for further processing from the point processing ceased."  These limited remedies contrast from the broad remedies available for claims of discrimination.  *See* 29 C.F.R. § 1614.501 ("When an agency, or the Commission, in an individual case of discrimination, finds that an application or an employee has been discriminated against, the agency shall provide full relief . . . .").  Because the regulations do not contemplate that Plaintiff may receive money damages or equitable relief for his breach of settlement agreement claim, Plaintiff's remedies are thus limited.  *See Frahm*, 492 F.3d at 262 ("[W]e find that the government has specifically limited by regulation

---

[13]  As mentioned above, some courts disagree, finding no subject matter jurisdiction. *See Lindstrom*, 510 F.3d at 1194 (interpreting 29 C.F.R. § 1614.504(a) to find that the court does not have subject matter jurisdiction); *Frahm v. United States*, 492 F.3d 258, 262 (4th Cir. 2007) ("Because neither the settlement agreement nor a statute allow Miss Frahm to sue the government for breach of the settlement agreement, her action was properly dismissed.").  The court departs from these decisions largely because they rely on an interpretation of 29 C.F.R. § 1614.504 in isolation, without reading all of 29 C.F.R. part 1614 in context.

the forms of relief a plaintiff may seek when she alleges breach of a Title VII

settlement agreement by a government agency.").

### 2.    *Summary Judgment on Count I*

#### a.    *Legal Framework for interpretation of settlement agreement*

"Federal law governs the interpretation of contracts entered pursuant

to federal law where the federal government is a party."  *Chickaloon-Moose Creek*

*Native Ass'n v. Norton*, 360 F.3d 972, 980 (9th Cir. 2004) (*citing O'Neill v. United*

*States*, 50 F.3d 677, 682 (9th Cir. 1995)).

> Pursuant to federal common law:
>
> A written contract must be read as a whole and every part
> interpreted with reference to the whole, with preference given
> to reasonable interpretations.  Contract terms are to be given
> their ordinary meaning, and when the terms of a contract are
> clear, the intent of the parties must be ascertained from the
> contract itself.  Whenever possible, the plain language of the
> contract should be considered first.

*Flores v. Am. Seafoods Co.*, 335 F.3d 904, 910 (9th Cir. 2003) (*citing Klamath*

*Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1210 (9th Cir. 1999)).

Where a contract is fully integrated and unambiguous, parol evidence

will not be admitted to contradict the contract's terms.  *See United States v. Triple*

*A Mach. Shop, Inc.*, 857 F.2d 579, 585 (9th Cir. 1988); *Schism v. United States*,

316 F.3d 1259, 1278 (Fed. Cir. 2002) (en banc) (The parol evidence rule provides

that if a contract is integrated, "barring certain limited exceptions . . . , a party to a written contract cannot supplement or interpret that agreement with oral or parol statements that conflict with, supplant, or controvert the language of the written agreement itself."); *see also Pierce County Hotel Employees & Rest. Employees Health Trust v. Elks Lodge, B.P.O.E. No. 1450*, 827 F.2d 1324, 1327 (9th Cir. 1987) ("Extrinsic evidence is inadmissible to contradict a clear contract term . . . .").

"[W]here a contract's meaning is not clear on its face, its interpretation depends upon the parties' intent at the time it was executed." *Az. Laborers, Teamsters & Cement Masons Local 395 Health & Welfare Trust Fund v. Conquer Cartage Co.*, 753 F.2d 1512, 1515 (9th Cir. 1985) (citation and quotation signals omitted). "A contract is ambiguous if reasonable people could find its terms susceptible to more than one interpretation." *Kennewick Irrigation Dist. v. United States*, 880 F.2d 1018, 1032 (9th Cir. 1989). However, "[t]he fact that the parties dispute a contract's meaning does not establish that the contract is ambiguous." *Int'l Union of Bricklayers & Allied Craftsman Local No. 20 v. Martin Jaska, Inc.*, 752 F.2d 1401, 1406 (9th Cir. 1985). "The existence of an ambiguity must be determined as a matter of law." *State Farm Mut. Auto. Ins. Co. v. Fernandez*, 767 F.2d 1299, 1301 (9th Cir. 1985).

34

b.      *Interpretation of settlement agreement*

At issue is the following sentence from the February 28, 2002

settlement agreement:

> SRF Management agrees to provide training to enhance Mr.
> Munoz' career within 12 months from the date of this
> agreement.

Pl.'s Ex. 1.  Defendant contends that the agreement does not specify any particular

training, and the plain words of the agreement merely required Defendant to

provide Plaintiff training that would enhance his career.  In contrast, Plaintiff

contends that this sentence should be construed as requiring Defendant to provide

him VLS training.[14]

The absence of a definition of the phrase "training to enhance Mr.

Munoz' career" does not render the language ambiguous.  The court concludes

that the phrase's meaning is clear -- within twelve months, Defendant was required

to provide Plaintiff training that would improve his career.  Reading the agreement

as a whole confirms the plain meaning of this phrase.  As the agreement recites, it

settled Plaintiff's allegation that:

> As the result of discrimination on the basis of race (Hispanic)
> and age (DOB 7/31/44), since January 1998 management of the

---

[14]  During his deposition, Plaintiff claimed that VLS training was the *only* training that would satisfy the settlement agreement.  *See* Def.'s Ex. 1, 79-80.

> Combat Systems Office, Ship Repair Facility, Yokosuka, Japan, has denied you Engineering Working Group (EWG) training and not allowed you to attend conferences.  The last incident was the EWG meeting of the MK-13 chain gun in April 2001.

*Id.*  Thus, to address Plaintiff's allegation that he was denied EWG training and not allowed to attend conferences, the parties agreed that Defendant would provide Plaintiff career enhancing training.  Accordingly, based on the agreement's unambiguous language and upon reading the settlement agreement as a whole, the court gives the phrase "training to enhance Mr. Munoz' career" its plain meaning.[15]

Each of Plaintiff's arguments for a contrary construction lacks merit. Plaintiff argues that the parties orally agreed that Defendant would provide him VLS training, Pl.'s Ex. 30, 71, and the court should look to statutory and regulatory definitions of "training," as well as the Navy personnel manual and human resources guidance, to interpret the scope of "training to enhance Mr. Munoz' career."  Pl.'s Mot. 17-18 (citing to 5 U.S.C. § 4101 and 5 C.F.R. § 410.101(d) & (e)).  The court rejects this invitation to consider extrinsic evidence to construe the agreement.[16]  Because the agreement's relevant language

---

[15]  The settlement agreement itself says nothing about VLS or VLS training.

[16]  Even if the court did consider these extrinsic sources, they would not support

(continued...)

is unambiguous, and the agreement contains an integration clause, supplementing the agreement in a manner that controverts the language of the agreement would violate the parole evidence rule. *See Triple A Mach. Shop, Inc.*, 857 F.2d at 585.

Further, even if the settlement agreement was ambiguous, Plaintiff's construction would be at odds with the underlying basis for the settlement. The agreement recites Plaintiff's allegations against the NSRF -- that he was denied EWG training and not allowed to attend conferences, such as the "EWG meeting of the MK-13 chain gun." Pl.'s Ex. 1. To construe the agreement as requiring VLS training -- and only VLS training -- would read out the very basis of Plaintiff's allegations that the agreement settled.

Finally, the court rejects Plaintiff's argument that, based on EEOC caselaw, the court should interpret career enhancing training as meaning "training which promotes advancement to higher grade positions." *See* Pl.'s Mot. 19. The cases cited by Plaintiff are wholly distinguishable on their facts and/or irrelevant.[17]

---

[16](...continued)
Plaintiff's proposed construction.

[17] Two cases that Plaintiff cites -- *Albrecht v. United States Postal Service*, 2005 WL 1870562 (E.E.O.C. Aug. 12, 2004), and *Howard v. Department of Commerce*, 2000 WL 1090557 (E.E.O.C. Jul. 20, 2000) -- did not involve construction of any agreement, and are unhelpful to the issues here. In *Allen v. Department of the Interior*, 1999 WL 683715 (E.E.O.C. Aug. 11, 1999), the defendant agreed to provide "training and/or developmental assignments designed to enhance appellant's competitiveness *for higher graded positions* for which he might apply and be fully qualified for." *Allen*, 1999 WL 683715, at *2 (emphasis added). Similar facts

(continued...)

If the parties intended that Defendant should provide Plaintiff training that would promote him to a higher grade position, the parties could have used such language in the settlement agreement.

c.   *Breach of settlement agreement*

During the 12-month post-settlement period, Plaintiff attended VLS deluge valve overhaul training, MK 44 machine gun training, and an MK 13 EWG conference.[18]  *See* Pl.'s Ex. 22, 159 (Training History for Munoz, Ysauro); Def.'s Ex. 6.  In determining whether any of this training was career enhancing, the court looks to the scope of Plaintiff's duties and his career with the NSRF.

At the time of settlement, Plaintiff was an Engineering Technician, level GS-12, and provided technical, repair and modernization services to the Navy's ships and weapons systems.  Pl.'s SMF ¶ 1; Def.'s Resp. to Pl.'s SMF ¶ 1; *see also* Pl.'s Ex. 2, 252 (Counselor's Report).[19]  Plaintiff worked on a number of systems, including MK 13 missile launchers, MK 32 torpedo tubes and related

---

[17](...continued)
are not presented here.

[18]  During the February 11, 2008 hearing, Defendant conceded that there was an issue of fact whether the MK 13 EWG conference was career enhancing.

[19]  Plaintiff argues that Defendant's Exhibit 13 establishes that 87% of Plaintiff's duties are on launcher systems.  Pl.'s Reply 14.  Plaintiff misstates the evidence.  For example, the exhibit describes that 60% of Plaintiff's time is spent on providing surface ship launcher systems, equipment/component technical support services and ordance handling equipment, although Plaintiff appears to allocate the full 60% to duties related to missile launching systems.

equipment, and MK 38 chain guns.[20]  Def.'s Ex. 10; *see also* Def.'s Ex. 13, 9 (listing weapon systems).  Further, Plaintiff was in the PPP awaiting return to the United States when a position for which he qualified became available.  Def.'s Ex. 2; Jan. 4, 2008 Rita Decl. ¶ 3.

In drawing all reasonable inferences on behalf of Plaintiff, the court finds that both the VLS deluge valve overhaul training and MK 44 machine gun training enhanced Plaintiff's career as an Engineering Technician, level GS-12. Both these courses gave Plaintiff new skills on systems that were related to his career and in demand by the Navy.  *See* Jan. 4, 2008 Rita Decl. ¶¶ 9, 11.  Indeed, Plaintiff was later provided responsibilities on the MK 44 at the NSRF.  *See* Def.'s Ex. 14 (notifying Plaintiff that the NSRF was able to perform work on the MK 44 at the operator level); Def.'s Ex. 15 (counseling Plaintiff that he was to provide assistance with the MK 44 as part of his duties).

Plaintiff's arguments fail to raise a material question of fact.  Plaintiff

---

[20]  Plaintiff describes his career as limited to missile launchers, such that VLS training would be the only appropriate replacement for his MK 13 duties.  *See* Pl.'s Ex. 3, Munoz Aff. ¶ 2.  Despite his affidavit, and as discussed above, the evidence presented establishes that Plaintiff  "normally worked on" not only MK 13 missile launchers, but other weapons systems. Def.'s Ex. 10; *see also* Def.'s Ex. 13, 9.  Plaintiff's attempt to narrow his work requirements to missiles, in light of the contrary evidence, is insufficient to create a fact question that only VLS training was career enhancing.  *See Hansen v. United States*, 7 F.3d 137, 138 (9th Cir. 1993) ("When the nonmoving party relies only on its own affidavits to oppose summary judgment, it cannot rely on conclusory allegations unsupported by factual data to create an issue of material fact.").

argues that MK 44 training was not career enhancing because it was not part of his job duties,[21] *see* Pl.'s Ex. 3, Munoz Aff. ¶ 10, but the agreement included no limitation that the training be on a system that he was working on at the time. Indeed, given that the MK 13 was being divested, providing training on new systems expanded Plaintiff's opportunities for work. Equally without merit is Plaintiff's argument that VLS deluge valve overhaul training was not career enhancing because it did not result in any certification or a full time position. *See* Woodworth Aff. ¶ 15. The settlement agreement did not require that the training result in a new, full time position; rather, the training had to enhance his career.

For these reasons, the court finds that there is no material issue of fact that Defendant complied with the settlement agreement within the 12-month period. However, even if none of the training provided to Plaintiff during the 12-month period was "career enhancing," there is no material issue of fact that Plaintiff was provided career enhancing training after this time. Specifically, Plaintiff attended Magazine Sprinkler Inspection and MK 45 training after the 12-month period. *See* Jan. 4, 2008 Cairney Decl. ¶ 4. The evidence presented

---

[21] The court rejects Plaintiff's further assertion that the NSRF was prohibited from working on the MK 44 as unsupported by any evidence. Plaintiff's bare declaration, in the face of contrary evidence, does not create a fact issue. *See Scott v. Harris*, 127 S. Ct. 1769, 1776 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

establishes that both these training opportunities were career enhancing.[22]  *See* Def.'s Ex. 1, 127-28.  Indeed, Plaintiff is now a MK 45 5-inch gun technician at the NSRF and is no longer on the PPP list for reassignment.  Jan. 4, 2008 Cairney Decl. ¶ 4.  Because Plaintiff's remedies on his breach of contract claim are limited to specific performance, the court could grant Plaintiff no further remedy.  Accordingly, the court GRANTS Defendant's Motion for Summary Judgment on Count I of the Amended Complaint.

## C.    Count II: Retaliation

Plaintiff contends that Defendant violated Title VII by denying him VLS training in retaliation for Plaintiff filing his EEO complaints.  The court sets forth the applicable legal framework, and then reviews the parties' arguments and evidence to determine that summary judgment should be granted in favor of Defendant.

///

---

[22]    During his deposition, Plaintiff confirmed that the Magazine Sprinkler Inspection training was career enhancing.  He also confirmed that the MK 45 training was career enhancing, although it was not the training he requested.  Def.'s Ex. 1, 127-28.  Plaintiff attempts to dispute this fact by relying on his deposition testimony on redirect that the MK 45 training was not career enhancing to his career as a missile technician.  *See* Pl.'s Ex. 29, 162-65.  Because the court rejects Plaintiff's assertion that his career was limited to missile launchers, this testimony does not create a fact question.  Further, nothing in the settlement agreement requires Plaintiff's approval of the training offered -- Plaintiff cannot unilaterally determine, under the settlement agreement, that only VLS training suffices.

### 1.   Legal Framework

Title VII makes it "an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]."  42 U.S.C. § 2000e-3(a); *see Burlington N. & Santa Fe Ry. Co. v. White*, 126 S. Ct. 2405, 2410 (2006) ("Title VII's anti-retaliation provision forbids employer actions that discriminate against an employee . . . because he has opposed a practice that Title VII forbids or has made a charge, testified, assisted, or participated in a Title VII investigation, proceeding, or hearing." (citations and quotation signals omitted)).

Pursuant to *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), Plaintiff has the initial burden to establish a prima facie case of retaliation. To make a prima facie showing of retaliation, Plaintiff must show that (1) he engaged in a protected activity; (2) Defendant took an adverse action against him; and (3) there was a causal link between his involvement in the protected activity and the adverse personnel action undertaken by Defendant.  *Freitag v. Ayers*, 468 F.3d 528, 541 (9th Cir. 2006); *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1124 (9th Cir. 2004).  "The requisite degree of proof necessary to establish a *prima facie* case for Title VII . . . on summary judgment is minimal and does not even

42

need to rise to the level of a preponderance of the evidence." *Cordova v. State Farm Ins. Cos.*, 124 F.3d 1145, 1148 (9th Cir. 1997) (citation omitted). Alternatively, Plaintiff may "proceed by simply producing 'direct or circumstantial evidence demonstrating that a [retaliatory] reason more likely than not motivated the employer.'" *Surrell v. Cal. Water Serv. Co.*, ---F.3d---, 2008 WL 638369, at *5 (9th Cir. Mar. 11, 2008) (*quoting Metoyer v. Chassman*, 504 F.3d 919, 931 (9th Cir. 2007)).

Under *McDonnell Douglas*, after Plaintiff establishes a prima facie showing of discrimination, the burden of production under the *McDonnell Douglas* framework shifts to Defendant to forward a legitimate -- which is to say non-retaliatory -- reason for its actions. *McDonnell Douglas Corp.*, 411 U.S. at 802. If Defendant does so, the burden shifts back to Plaintiff to show that the given reason is merely pretext for a retaliatory motive. *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1028 (9th Cir. 2006); *see also Nilsson v. City of Mesa*, 503 F.3d 947, 954 (9th Cir. 2007) (Plaintiff "bears the ultimate burden of submitting evidence indicating that the [Defendants'] proffered reason is merely a pretext for a retaliatory motive." (citation and quotation signals omitted)).

To show pretext, Plaintiff needs to do more than merely deny the credibility of Defendant's proffered reason. *See Schuler v. Chronicle Broad. Co.*,

793 F.2d 1010, 1011 (9th Cir. 1986).  "A plaintiff can show pretext directly, by showing that discrimination [or retaliation] more likely motivated the employer, or indirectly, by showing that the employer's explanation is unworthy of credence." *Vasquez v. County of L.A.*, 349 F.3d 634, 641 (9th Cir. 2003).  Plaintiff can make either showing through direct or circumstantial evidence.  *Coghlan v. Am. Seafoods Co.*, 413 F.3d 1090, 1095 (9th Cir. 2005).  "Direct evidence typically consists of clearly sexist, racist, or similarly discriminatory [or retaliatory] statements or actions by the employer."  *Id.*  Circumstantial evidence requires an additional inferential step to demonstrate retaliation.  *Id.*  In order to survive summary judgment, the circumstantial evidence offered by Plaintiff "must be 'specific and substantial' to defeat the employer's motion for summary judgment."[23]  *Id.* (citation omitted); *Mondero v. Salt River Project*, 400 F.3d 1207, 1213 (9th Cir. 2005); *Bodett v. CoxCom, Inc.*, 366 F.3d 736, 743 (9th Cir. 2004).

///

///

///

---

[23]  Although *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1030-31 (9th Cir. 2006), questioned whether a "specific and substantial" showing is required, the three-judge panel did not overrule the applicability of this standard.  In fact, *Nilsson v. City of Mesa*, 503 F.3d 947, 954 (9th Cir. 2007), applied the "specific and substantial" standard after *Cornwell* questioned its applicability.  The court applies the "specific and substantial" standard to the present matter.

## 2.      *Application of Framework*[24]

For purposes of summary judgment, Defendant assumes that Plaintiff can establish a prima facie case of retaliation.  Defendant instead argues that it had legitimate reasons for denying Plaintiff VLS training, which Plaintiff has not shown are merely pretext.  *See* Def.'s Mot. 11.  The court sets forth each of Defendant's reasons below, and then analyzes each of Plaintiff's arguments regarding pretext.

### a.      *No vacant VLS position*

Defendant states that it denied Plaintiff VLS training because it had no open VLS position at the NSRF.  Defendant originally had two VLS billets, one that was already filled, and the other that was "permanently downgraded to GS-11."  Pl.'s Ex. 22, 137.  Defendant could not fill the VLS billet at a GS-11 level "due to the extensive training and experience needed to achieve" the qualifications for a VLS technician.  Pl.'s Ex. 21.  As a result, the open VLS billet was transferred and/or deleted.  *Id.*; *see* Pl.'s Ex. 22, 137.

In response, Plaintiff argues that (1) in 2002, the Launcher Branch

---

[24] Because Plaintiff did not produce "direct or circumstantial evidence demonstrating that a [retaliatory] reason more likely than not motivated the employer,'" the court and parties applied the *McDonnell Douglas* burden-shifting framework.  *See Surrell v. Cal. Water Serv. Co.*, ---F.3d --- , 2008 WL 638369, at *5 (9th Cir. March 11, 2008) (*quoting Metoyer v. Chassman*, 504 F.3d 919, 931 (9th Cir. 2007)).

had a vacant VLS position; (2) Rita could fill the position at GS-12 by re-writing

the position description; (3) Rita was aware of the need for more VLS technicians;

and (4) Defendant could add new billets.[25]  Pl.'s Resp. SMF ¶ 7.

        None of these arguments creates a fact question that Defendant did

not have an open VLS position.  That a vacant VLS position existed on paper does

not establish pretext.  Indeed, Defendant's explanations to Plaintiff why it denied

him this training explain why a vacancy existed: one VLS position was down-

graded from GS-12 to GS-11, which prevented this job from being filled (and

remaining vacant) "due to the extensive training and experience needed to

achieve" the qualifications for a VLS technician.  *See* Pl.'s Ex. 21.  Plaintiff, a GS-

12, does not argue that he would have taken a GS-11 billet.

        Plaintiff provides no legal or factual support for the proposition that

Defendant should have re-written the VLS position description for Plaintiff and/or

created a new VLS technician position specifically for Plaintiff.[26]  However, to the

extent Plaintiff argues that divestment of the MK 13 entitled him to VLS training --

---

[25]  Plaintiff also argues that Defendant gave false reasons for downgrading the VLS position from GS-12 to GS-11.  Even if true, however, there is no evidence that Defendant downgraded this position to prevent Plaintiff from filling this position.  These events occurred in May 2001, *see* Pl.'s Ex. 25, well before Plaintiff's first request for VLS training.

[26]  Plaintiff alleges that Defendant retaliated against him by denying him VLS training, not that Defendant had a duty to hire Plaintiff as a VLS technician and/or create a position for him.

and VLS training only -- the facts establish otherwise.  Plaintiff worked on several weapons systems, which allowed for an array of training possibilities to replace his MK 13 responsibilities.  Defendant, recognizing that the MK 13 divestment would limit Plaintiff's responsibilities, looked for training opportunities to replace these specific skills:

> This command has no obligation to "Re-Train" [Plaintiff] in another system simply because of that, but do need to ensure that he has meaningful work to do while still employed at SRF. To that end, Mr. Cairney has identified and proposed relevant career enhancing training as a Magazine Sprinkler Inspector and on the new MK 45 MOD 4 5"/62 Caliber Gun System.  I advised Mr. Munoz that this training was approved, pending availability of billets.

Pl.'s Ex. 22, 134.  As discussed above, Plaintiff was provided training on new systems, which ultimately resulted in Plaintiff receiving a new billet with the NSRF.

    b.    *Plaintiff's qualifications*

Defendant explains that VLS training would not qualify Plaintiff for a VLS position, even if Defendant had an opening.  The VLS SMT position at the NSRF requires an SMT certification card, followed by ten years experience as a VLS technician in a mainland facility.  Jan. 4, 2008 Rita Decl. ¶ 7; Def.'s Ex. 5. Even if Plaintiff received VLS training, he would not meet these requirements.

In response, Plaintiff argues that (1) he is well-qualified for a position; (2) Rita revised the VLS position description to block Plaintiff; and (3) others filled VLS positions without meeting the revised position description.

Plaintiff's arguments are unsupported by evidence.  Plaintiff has presented no evidence that even if the NSRF had an open VLS billet, this training would qualify him for it.[27]  Nor does Plaintiff have any evidence that Defendant intentionally revised the VLS position description so that Plaintiff could not qualify for it.  The VLS position description was revised in July 2001, Feb. 1, 2008 Rita Decl. ¶ 2, months before the settlement agreement or Plaintiff's first request for VLS training.  Accordingly, Plaintiff has not established that at the time Defendant revised the VLS technician position description, Defendant was even aware that Plaintiff wanted VLS training, much less purposely revised the position description to block Plaintiff.[28]  Plaintiff's conclusory statements to the contrary do not create a

---

[27]  In his Reply and at the hearing, Plaintiff argued that VLS training could nonetheless qualify him for positions outside of Yokosuka.  Even if VLS training would qualify Plaintiff for positions outside of Yokosuka, there is no evidence that Defendant had a duty to train Plaintiff to qualify for a position of Plaintiff's choosing anywhere within the Navy.  Rather, Defendant recognized the need to re-train Plaintiff to ensure that he had meaningful work to do while still employed at the NSRF.  Pl.'s Ex. 22, 134.

[28]  During the February 11, 2008 hearing, Plaintiff's counsel was given the opportunity to show what evidence on the record supported his assertion that Plaintiff had requested VLS training prior to the settlement agreement.  Plaintiff directed the court to the EEO record investigating his initial complaints, but these documents only evince a general allegation that Plaintiff was denied training, and not that he specifically requested VLS training.  Further, in

(continued...)

genuine issue of material fact. *See Surrell*, 2008 WL 638369, at *6 (finding that the plaintiff's general statement that she "had never seen any black people promoted" was insufficient for a trier of fact to conclude that Defendant's reason for hiring someone else was pretextual); *Thornton v. City of St. Helens*, 425 F.3d 1158, 1167 (9th Cir. 2005) (holding that "conclusory statements of bias do not carry the nonmoving party's burden in opposition to a motion for summary judgment"); *Lindsey v. Shalmy*, 29 F.3d 1382, 1385 (9th Cir. 1994) ("Mere conclusory assertions of discriminatory intent, embodied in affidavits or deposition testimony, cannot be sufficient to avert summary judgment.  The court must satisfy itself that there is sufficient 'direct or circumstantial evidence' of intent to create a genuine issue of fact for the jury, before it can deny summary judgment . . . .").

Nor is there any evidence that Defendant allowed any individual to hold a VLS billet without meeting the revised position description.  Two of the individuals who held VLS positions (Woodworth and Chambers) received their billets prior to 2001.  In his Opposition Statement of Material Facts in Dispute ("Plaintiff's Opposition Statement"), Plaintiff asserts that Rita did not require

---

[28](...continued)
response to a deposition question "[p]rior to signing the settlement agreement had you ever requested VLS training?" Plaintiff responded "I think so, but I'm not sure on that."  Pl.'s Ex. 30, 70.  The evidence presented is insufficient to raise a fact question that Defendant was aware that Plaintiff wanted VLS training in 2001 when the position description was revised.

Preciado, who replaced Chambers, to meet the revised position description in December 2001.  Pl.'s Resp. SMF ¶ 7.  The court reviewed all of the evidence cited in Plaintiff's Opposition Statement, and found no evidence that indicates that Preciado did not meet the revised VLS position description.  Nor is the court aware of any other evidence on the record that supports Plaintiff's assertion.  The court therefore rejects Plaintiff's argument as unsupported by admissible evidence.  *See Tarin v. County of L.A.*, 123 F.3d 1259, 1265 (9th Cir. 1997) ("Because [plaintiff] points to nothing in the record, other than her own conclusory statements, to refute the County's explanations for its decisions, we affirm the district court's grant of summary judgment to defendants with respect to [plaintiff's] claims of unlawful retaliation.").

        *c.*     *Funding for training*

Defendant contends that VLS training occurred on the mainland, which would require others to absorb Plaintiff's duties while he attended the class and cost Defendant $17,000 -- one third of the NSRF's annual training budget.  Jan. 4, 2008 Rita Decl. ¶ 7(d).  Thus, Defendant "would not spend thousands of dollars in training [Plaintiff] in a skill that Plaintiff could not be used for."  Pl.'s Ex. 21.

Plaintiff argues that the fact that Defendant sent him on other training

on the mainland establishes pretext.[29]  To the contrary, this fact does not rebut

Defendant's decision that the time and money it would cost to send Plaintiff to

VLS training was not worth the return.  With budget concerns, Defendant decided

that it "would not spend thousands of dollars in training [Plaintiff] in a skill that

Plaintiff could not be used for."  Pl.'s Ex. 21.  Indeed, Rita has never authorized

anyone to attend VLS training, Jan. 4, 2008 Rita Decl. ¶ 8, and Defendant offered

Plaintiff training on other systems "to ensure that he has meaningful work to do

while still employed at SRF."  Pl.'s Ex. 22, 134.

> ### d.  *Evidence of discriminatory intent*

Plaintiff claims that an April 2, 2002 email between Rita and Nolan

establishes pretext.  The court disagrees.

In the email, Rita iterated the same reasons for denying Plaintiff VLS

training as he later told Plaintiff on multiple occasions:

> (A) Our new VLS Technician, Mr. V. Preciado will be arriving
> later this month.  He is a Certified System Maintenance
> Technician (SMT) capable of handling all VLS work.  Even

---

[29]  In his Motion for Summary Judgment, Plaintiff also posits that there was no charge for VLS training, and that Defendant trained four Japanese nationals to do VLS work.  Pl.'s Ex. 3, Munoz Aff. ¶ 16.  Although the training itself was at no cost, Rita explained that the $17,000 cost that the NSRF would incur included the per diem, car rental, and travel for the three-month long VLS class.  Jan. 4, 2008 Rita Decl. ¶ 7(d).  Defendant also explained that no Japanese nationals were ever certified as either SMT or TD VLS technicians, and these Japanese nationals work under the SMT/TD certified personnel as mechanics.  Jan. 24, 2008 Cairney Decl. ¶ 3. Plaintiff does not contend that he would take a mechanic's position under a SMT.

with the training, Mr. Munoz is requesting, he would not have the necessary credentials to function in this field without years of additional hands on experience and sponsorship from someone in the VLS community.  He'd essentially be a helper and we already have an MLC in C190 who fulfills that role as do some of our shop personnel, so we really don't need another helper.  This is not as "career enhancing" as he might think.
(B) We have requested a change in our USN Billet Structure converting a SPY-1A Technician to VLS Technician which we expect to have approved and the new CPO on board this year. Two VLS Technicians is more than adequate to cover work on our VLS ships even during high port loading.
[(C)] This training is cost prohibitive.  Total cost for over 3 months of school is around $17,000 . . . . I am not going to spend 1/3 of my annual training for the department on one individual.

Pl.'s Ex. 31.  In response to Rita's request for "professional help" to prevent

additional assertions of discrimination by Plaintiff, Nolan stated:

There was never anything in the settlement agreement that stated he could request any courses.  You are not obligated in anyway to approve any training requests from him. Furthermore, he has contacted me and informed me he does not believe mgt has complied with the settlement agreement regarding the letter of regret he received.  Therefore, until further notice, all bets are off.

*Id.*

This email does not demonstrate that Defendant's stated non-

retaliatory reasons for denying VLS training were pretext for a retaliatory motive.

As the email shows, before he sought Nolan's "professional advice" on dealing

with Plaintiff's request for VLS training, Rita had independently determined that he would deny the request.  Thus, Rita's decision to deny Plaintiff training could not factually be based on Nolan's comment that "all bets are off;" Rita had already decided not to approve Plaintiff's request based on legitimate reasons.  Indeed, Rita has consistently articulated each of these legitimate reasons in response to each of Plaintiff's requests.  *See* Pl.'s Ex. 21, Pl.'s Ex. 22, 134 & 137.

Further, Plaintiff does not argue that he was denied any *other* training opportunities -- instead, he only claims that the denial of VLS training was retaliatory.  Even after Nolan's email, Defendant offered Plaintiff multiple training opportunities, which this court finds were career enhancing.  *See supra* § IV(B)(2)(c).  Given these opportunities afforded to Plaintiff, this email does not establish a genuine issue of material fact that Plaintiff was denied VLS training in retaliation for filing his EEO complaints.

In sum, the arguments put forth by Plaintiff are neither direct evidence of pretext nor the "specific and substantial" evidence needed to rebut that Defendant's reasons for denying him VLS training.  *See Coghlan*, 413 F.3d at 1095; *Nilsson, Robbins, Dalgarn, Berliner, Carson & Wurst v. La. Hydrolec*, 854 F.2d 1538, 1545 (9th Cir. 1988) ("In the absence of specific facts, as opposed to allegations, showing the existence of a genuine issue for trial, a properly supported

summary judgment motion should be granted."). Rather, the evidence presented establishes that there were no open VLS billets, and that the training would not qualify Plaintiff for a VLS billet in the NSRF even if an opening existed. The court therefore GRANTS Defendant's Motion for Summary Judgment on Count II.

## V.  <u>CONCLUSION</u>

For the reasons discussed above, the court DENIES Plaintiff's Motion for Summary Judgment, and GRANTS Defendant's Motion for Summary Judgment on Count I and Count II.

Because no Counts of the Amended Complaint remain, the court ORDERS the Clerk of Court to close this case.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, March 17, 2008.



/s/ J. Michael Seabright
J. Michael Seabright
United States District Judge

*Munoz v. England*, Civ. No. 06-00649 JMS/KSC, Order (1) Denying Plaintiff's Motion for Summary Judgment, and (2) Granting Defendant's Motion for Summary Judgment